IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


MARCELO VASQUEZ-SANCHEZ                                    PLAINTIFF

                    v.                      Civil No. 09-5105

DEPUTY PRUITT; DR. HUSKINS;
CAPTAIN HUNTER PETRAY;
and SHERIFF KEITH FERGUSON                                 DEFENDANTS


## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The Plaintiff, Marcelo Vasquez-Sanchez, filed this civil rights action pursuant to 42 U.S.C. § 1983.  He proceeds *pro se* and *in forma pauperis*.

Plaintiff is currently an inmate of the Ouachita River Correctional Unit of the Arkansas Department of Correction (ADC).  The events at issue in this action occurred while Plaintiff was incarcerated in the Benton County Detention Center (BCDC) from April 5, 2008, until his transfer to the ADC on June 3, 2009.  While at the BCDC, Plaintiff contends he was subjected to excessive force and denied adequate medical care.

Defendants filed a summary judgment motion (Doc. 17).  Plaintiff filed a response (Doc. 24) to the motion within the time specified by the Court (Doc. 23).  The motion is now ready for decision.

## Background

Plaintiff was booked into the BCDC on April 5, 2008.  Defendants' Exhibit (hereinafter Defts' Ex.) 1 at page 1.  He was sentenced to a term of imprisonment on January 13, 2009.

-1-

AO72A
(Rev. 8/82)

http://www.adc.arkansas.gov. He remained incarcerated at the BCDC until June 3, 2008, when

he was transferred to the ADC. Id. at page 4.

The BCDC uses a single form for the inmates to submit grievances, requests, and medical

requests. See e.g., Defts' Ex. 2 at page 1. The inmates are directed to circle the word grievance,

request or medical when they submit the document. During his incarceration at the BCDC, the

Plaintiff submitted numerous medical requests. Defts' Ex. 2; see also Complaint (Doc. 1). The

requests and responses to them were as follows:

April 7, 2008, for a severe rash. In response, Plaintiff was seen by Dr. Huskins
on April 9th and prescribed hydrocortisone cream and Amoxicillin;

April 17th for a tooth that was hurting badly and needed pulling. In response,
Plaintiff was seen by Dr. Huskins on April 18th and prescribed saline rinses for
seven days;

April 24th for a tooth that was aching and kept him from eating and sleeping. In
response, Plaintiff was seen by Dr. Huskins on April 25th and prescribed saline
rinses and Benadryl;

April 26th for a "very bad" toothache. In response, Plaintiff was seen on April
30th, prescribed Tylenol and a notation was made the tooth should be extracted;

May 7th for a rash and toothache. In response, Plaintiff was seen by Dr. Huskins
and prescribed saline rinses, Benadryl, and Amoxicillin;

May 12th for very bad pain in his tooth. Plaintiff was seen on May 14th.
However, the medical records regarding prescribed medication are illegible;

May 15th for a toothache;

May 17th for a tooth causing him "very bad pain" that needed to be pulled;

May 22nd Plaintiff was seen by Dr. Stephen G. Harrington, D.D.S. However,
the records do not indicate what, if any, work was done on Plaintiff's teeth;

-2-

May 27th asking for pain medication for his toothache and cream for his itching stomach.  In response, Plaintiff was seen by Dr. Huskins and prescribed Benadryl;

May 31st for rashes and allergies;

June 4th Plaintiff was seen by the nurse for complaints of pain in his side and leg. He was prescribed Aleve;

June 19th for a sore throat.  In response, Plaintiff was seen by Dr. Huskins on June 23rd and prescribed Sudafed;

July 2nd the Plaintiff was seen again by Dr. Huskins and prescribed Sudafed;

July 15th for pain in his genital area; In response, Plaintiff was seen by Dr. Huskins on July 18th for dysuria.[1]  Dr. Huskins noted that Plaintiff reported being hit in the inguinal area.  Examination showed normal male genitalia.  Note was made that Plaintiff's urine was clear.  Tylenol was prescribed;

July 22nd indicating his testicles had been injured and he was hurting so much that it was making him sick;

July 28th for bleeding during urination and pain in his testicles.  In response, Plaintiff was seen by Dr. Huskins on July 30th.  Dr. Huskins noted the Plaintiff was complaining of hematuria.[2]  The urinalysis was negative, the chest clear, the heart had a murmur and the abdomen was soft.  Cipro was prescribed;

August 1st for swollen and painful testicles (both grievance and medical circled). Plaintiff was seen by Dr. Huskins that day and prescribed Aleve and Amoxicillin;

 August 3rd asking for medication for pain and complaining that the medication he was receiving as a result of the pain in his testicles was not working.  Plaintiff was seen by Dr. Huskins on August 6th for intermittent inguinal pain.  The examination revealed no hernia, normal genitals, and the testicles were negative. Doxycycline was prescribed;

August 12th complaining the medication for pain in his testicles was not working, having an allergic reaction to it, and needed something else for pain.

---

[1]Dysuria is the  medical term for pain or discomfort when urinating.  http://nlm.nih.gov/medlineplus/urineandurination.html

[2] Hematuria is the presence of red blood cells in the urine. To determine the cause of hematuria, or to rule out possible causes, a number of tests may be used including urinalysis, blood tests, kidney imaging studies, and cystoscopic examinations.  If no serious condition is causing the hematuria, no treatment is necessary.  http://kidney.niddk.nih.gov/kudieases/pubs/hematuria

AO72A
(Rev. 8/82)

In response, Plaintiff was seen by Dr. Huskins on August 13th and prescribed Aleve;

August 22nd stating his testicles were still hurting and the medicine he received was making him excrete a yellow fluid and had not helped with the pain. Plaintiff was seen by Dr. Huskins on August 24th. He noted that the examination and urinalysis were both negative;

August 29th complaining that his private area was hurting;

August 30th because of swollen and painful testicles and a possible hernia. In response, Plaintiff was seen by Dr. Huskins on September 3rd. Dr. Huskins indicated there was no hernia and the testicles were negative. Plaintiff was prescribed Tylenol;

September 13th addressed to the captain about abuse (being hit in the testicles) and nothing being done in response to his medical requests (grievance circled). Told that if he had a medical issue he needed to submit a medical request. Also informed that he had been at the BCDC for five months and had not previously complained of being hit;

September 15th stating the judge had ordered him to be seen by the jail doctor and if necessary he should be taken to a specialist about the pain and swelling in his testicles;

September 19th complaining about pain in his testicles and stating he really needed something done in addition to the medication he was receiving. Plaintiff was seen by Dr. Huskins that day. Dr. Huskins' notes indicate Plaintiff reported being significantly improved on the current medication. Dr. Huskins ordered a continuation of the Tylenol prescription;

September 22nd Plaintiff was seen by Dr. Huskins who noted Plaintiff had improved. The Tylenol prescription was continued;

October 8th a grievance stating a month ago the court had ordered that he be taken to a specialist regarding the pain in his genitals. Nothing had been done and he was in "horrible pain" everyday and could not urinate. Told that the grievance would be forwarded to medical and the doctor makes the medical decisions in the jail;

October 11th stating his genitals had been hurting for over two months, the pain medication he was receiving did not help, and the judge had ordered that he be taken to a specialist but nothing was done. In response, Plaintiff was seen by Dr.

-4-

Huskins on October 13th. Dr. Huskins noted the Plaintiff stated his testicular pain had improved on medication. The examination showed normal male genitals, no hernia, and no testicular masses. The Tylenol prescription was continued;

October 16th requesting a white cotton blanket because he developed a rash from the blanket he had. In response, on October 17th, the nurse prescribed hydrocortisone cream. Plaintiff was told the medical staff had nothing to do with the blankets;

November 1st complaining that his testicles were still swollen, he was urinating blood, and it hurt when he walked. In response, Plaintiff was seen by Dr. Huskins on November 3rd. Dr. Huskins noted Plaintiff was doing well on medication. The Tylenol prescription was continued.

November 24th complaining that the aspirin he was prescribed did nothing for the pain and swelling in his testicles or the blood in his urine. He asked for some "other type of examination" and for something so he could sleep. In response, he was seen by Dr. Huskins on November 26th. Dr. Huskins noted Plaintiff was doing well on medication and wanted to continue;

December 8th requesting bed rest and a visit to the doctor or nurse because of swollen testicles and pain. In response, Plaintiff was seen by Dr. Huskins and prescribed Tylenol. It appears other medication was prescribed but the notes are illegible.

December 27th complaining of pain in his testicles and an inability to sleep. Plaintiff was seen by Dr. Huskins on December 31st. He noted an improvement in Plaintiff's condition and prescribed Tylenol. It appears other medication was prescribed but the notes are illegible.

December 29th complaining of pain in his testicles, an inability to sleep, and asking to see the nurse or doctor. In response, Dr. Huskins examined the Plaintiff on January 4th and prescribed Tylenol and Vaseline;

January 4, 2009, requesting something to help him sleep at night. In response, the nurse wrote that sleeping pills were not prescribed.

January 7th complaining of a sore in his mouth and asking to see the doctor or nurse. Dr. Huskins saw the Plaintiff on January 9th and prescribed saline rinses and Tylenol;

-5-

January 13th, the nurse explained, through an interpreter, that all urinalysis' had been negative for blood. Plaintiff states the blood in his urine came and went when he worked out;

January 19th indicating he had a rash on his buttock also asking for more Tylenol for pain. In response, Plaintiff was seen by Dr. Huskins on January 21st and prescribed Bactrim and Tylenol;

January 27th requesting a visit to the doctor or nurse regarding cold or flu symptoms. Plaintiff was prescribed some type of medication on January 28th. However, the notes are illegible;

February 8th Plaintiff was brought to the nurse's station because of complaints of bleeding from his penis or scrotum. A urinalysis was performed and was negative for blood. Plaintiff's boxer shorts did contain seven or eight smears of a red color approximately 2 to 3 mm. in size;

February 9th the Plaintiff was seen by Dr. Huskins and prescribed Doxycycline;

February 12th stating he no longer wished to take his medication because it made him sleepy and gave him a headache. He also asked to see the doctor. The nurse responded that the medication was an antibiotic;

February 13th the Plaintiff was seen by Dr. Huskins and prescribed Cipro;

February 18th the nurse noted she and Deputies Johnston and Collins observed the Plaintiff in the day room sitting at a table, bouncing up and down on the stool, laughing, jumping to his feet, lifting each leg high in the air, and flailing his arms. The nurse noted Plaintiff had no apparent difficulty making these movements;

February 24th stating he had a "fire blister" under his tongue that kept hurting and asking for medication for it. In response, Plaintiff was seen by the doctor. However, the handwritten notations on Plaintiff's chart from this visit are illegible;

March 5th indicating he was having stomach problems and could not use the toilet. He asked for something to loosen his stomach up. On March 6th, the nurse noted Plaintiff was constipated and prescribed Milk of Magnesia;

March 11th requesting some different medication for constipation. In response, Plaintiff was seen by Dr. Huskins on March 13th and was prescribed Milk of Magnesia;

-6-

March 30th complaining of a sore throat and headache.  Plaintiff was seen by Dr. Huskins on April 1st and treated for an upper respiratory infection.  Plaintiff was prescribed cough medicine;

April 7th asking for a refill of Tylenol prescription for pain in his testicles. Plaintiff was examined by Dr. Huskins on April 8th and prescribed Tylenol;

April 18th indicating he had bumps and a rash on his stomach and both legs. Plaintiff was seen by Dr. Huskins on April 20th and prescribed hydrocortisone cream;

April 26th asking for a refill of the Tylenol prescription for pain in his testicles. The nurse approved the refill of the Tylenol on April 27th;

April 29th complaining of a "real nasty rash" spreading from his hip to stomach and to "backside."  Asking to see the doctor to obtain some ointment.  In response, he was seen by Dr. Huskins on May 1st and prescribed hydrocortisone cream;

May 18th complaining of a rash on his buttocks.  Plaintiff was seen by the doctor on May 20th and prescribed hydrocortisone cream;

May 26th the prescription for hydrocortisone cream was renewed; and

May 30th asking for a refill of Tylenol prescription for pain in his testicles.  The prescription was renewed by the nurse on June 1st.

Defts' Ex. 2; Complaint (Doc. 1) at pages 26, 28, and 33; Defts' Ex. 5; Defts' Ex. 3.

Plaintiff maintains that on July 15, 2008, when he was coming back to his cell from church he was assaulted by Deputy Pruitt (hereinafter Pruitt).  Complaint (Doc. 1); Plaintiff's Response (hereinafter Resp.) at page 1.  Plaintiff asserts that Pruitt hit him so "hard in my private" area that to this day "I am urinating blood." Resp. at page 1.  He also maintains that he is having back problems as a result of the injury.  Id. at page 1.

Plaintiff mentions an assault by Deputy Johnson (hereinafter Johnson).  Resp. at page 1. While there is an incident report included in the exhibits submitted by Defendants regarding an

August 24, 2008 incident involving Johnson and the Plaintiff, there was no mention in the complaint about this incident and Johnson is not a party to this lawsuit.  Defts' Ex. at page 3.

On a separate occasion, Plaintiff asserts he sustained further injuries during a pod search conducted by Deputy Tucker (hereinafter Tucker).  Resp. at page 5.  Plaintiff indicates that until this assault he had stopped urinating blood and the assault caused him to start bleeding again.  Id.  An incident report was prepared by Tucker regarding this incident occurring on February 7, 2009.  Defts' Ex. 4 at page 8.  According to the report, after a search of the day room in D-149 on February 7, 2009, the deputies began patting down the inmates who were facing the wall.  Id.  Plaintiff was one of the inmates being patted down by Tucker.  Id.  After Tucker inserted his thumbs into Plaintiff's waistband and slid his thumbs to the front and then the back of the waistband, he grasped Plaintiff's pants and shook them up and down to dislodge any contraband.  Id.  When this happened, Plaintiff took his hands off the wall, attempted to turn towards Tucker, and began speaking rapidly in Spanish.  Id.  Tucker reported that he took control of Plaintiff's left hand and placed it on the wall.  Id.  At that point, Plaintiff reached down toward his waist with his right hand.  Id.  Tucker took control of Plaintiff's right hand and placed it on the wall.  Id.  Tucker was told by another inmate that Plaintiff had said:  "his testicles are broke."  Id.  Tucker again told Plaintiff to keep his hands on the wall and continued the pat down.  Id.

Plaintiff submitted a grievance on February 7th stating that Tucker had "hit my testicles after I told him that my testicles are injured."  Defts' Ex. 6 at page 4.  If he was injured further, Plaintiff stated he would file suit.  Id.  Plaintiff did not name Tucker as a party to this lawsuit.

On February 8, 2009, Plaintiff reported that he was bleeding from his penis after he urinated.  Defts' Ex. 4 at page 9.  He reported pain in his testicles.  Id.  Plaintiff was asked to

-8-

allow Tucker and Corporal Frischman to check for signs of bleeding.  Id.  They reported no obvious signs of bleeding from Plaintiff's penis, testicles, or scrotum.  Id.  A picture was taken of Plaintiff's boxers to document blood that was on them.  Id. at page 10.

Plaintiff reported that he had this condition since July 15th.  Defts' Ex. 4 at page 10.  He stated Pruitt had struck him in the testicles during a pat down.  Id.  Plaintiff indicated the bleeding and pain had occurred  about six times since he was struck.  Id.  Plaintiff stated that the bleeding reoccurred usually when he worked out and lasted about a day and then started going away.  Id.  He further stated that the nurse did not believe him because, by the time he was seen, the bleeding had stopped and all he had was pain.  Id.

Plaintiff states the doctors at the ADC are not providing him with adequate treatment. Resp. at page 7.  He indicates no testing has been done to determine what is causing the pain in his testicular area.  Id.

Plaintiff's ADC medical records indicate he underwent an intake physical on June 6, 2009.  Defts' Ex. 8 at page 1.  Plaintiff complained of chronic back pain and it was noted he had limited range of motion with forward bending and was unable to perform heel to toe ambulation. Id. at page 3.  He also had limited range of motion in his left arm.  Id.  He was unable to raise or abduct his arm without a great degree of pain.  Id.  He reported a history of having fallen in the shower in February of 2009.  Id.  He also reported that his testicles had been hit while he was in Benton County.  Id.

On June 9th, Plaintiff submitted a health services request form.  Defts' Ex. 8 at page 14. He complained of back, shoulder, and testicular pain.  Id.

-9-

Plaintiff submitted a sick call request on June 23rd.  Defts' Ex. 8 at page 22.  He complained that his testicles were swollen, there was blood in his urine, his left shoulder was hurting and his hearing was getting bad.  Id.

On June 24th, Plaintiff was seen in the infirmary complaining of blood in his urine, a boil on his right arm and right side of his face, and pain in his shoulder.  Defts' Ex. 8 at page 21.  He was referred to a physician.  Id.  A urinalysis revealed no blood in his urine.  Id.

On July 13th, Plaintiff asked to be seen for testicular, back, and shoulder pain.  Defts' Ex. 8 at page 19.  Plaintiff was seen in the infirmary on July 14th after he fell in the shower the evening before.  Id. at page 20.  He was unable to perform range of motion with his left arm.  Id. No swelling, redness, or warmth was noted at the site of the pain.  Id.  He was instructed to use a cold pack as needed for twelve hours and prescribed Acetaminophen.  Id.

Plaintiff was seen at the infirmary on July 15th for a follow-up on his testicular pain. Defts' Ex. 8 at page 18.  It was noted that Plaintiff had been complaining about this for some time and indicated his testicles hurt when he walks.  Id.  He was not assessed for testicular pain but was referred to a physician for assessment.  Id.

On July 16th, Plaintiff submitted a medical request complaining of pain in his testicles, shoulder and back.  Defts' Ex. 8 at page 17.  Plaintiff was seen by a nurse on July 20th complaining of pain in his testicles and back.  Id. at page 16.  Plaintiff reported getting kicked in the testicles by officers while in the county jail.  Id.  Mild tenderness was noted upon palpation of the testicles.  Id.  He was referred to a doctor and prescribed Acetaminophen.  Id.

Plaintiff was seen on July 21st by Dr. Charles Liggett.  Defts' Ex. 8 at page 28.  Plaintiff complained of severe testicular pain and severe left shoulder pain.  Id.  It was noted that he was

-10-

walking hunched over due to testicular pain.  Id.  Dr. Liggett noted Plaintiff did not have this gait on his prior visit.  Id.  Dr. Liggett indicated the testicular problem was new.  Id.  The testicular examination was normal except for severe diffuse scrotal tenderness.  Id.

On September 21st, Plaintiff was seen in the infirmary complaining of pain in his testicles, blood in his urine, and difficulty sleeping.  Defts' Ex. 8 at page 26.  He was prescribed Ciprofloxacin.  Id.

Plaintiff was seen by Dr. Liggett on October 2nd.  Defts' Ex. 8 at page 25.  He was complaining of testicular pain, recent onset diarrhea, and chest erythema.  Id.  He was prescribed Ciprofloxacin and hydrocortisone cream.  Id.

On October 19th, Plaintiff submitted a health services request form.  Defts' Ex. 8 at page 12.  He stated his testicles were hurting and he was in a lot of pain.  Id.  He asserted that he needed to stay on medication because as soon as the prescription was out he was in pain again. Id.  Finally, Plaintiff noted that his back was also causing him a lot of pain.  Id.

Plaintiff was seen by a licensed practical nurse (LPN) on October 20th.  Defts' Ex. 8 at page 13.  Swelling in his testicles was noted.  Id.  Plaintiff was referred to a physician for follow-up.  Id.

On October 22nd, a report of a health services encounter indicates Plaintiff was seen in the infirmary complaining of swollen testicles and blood in his urine.  Defts' Ex. 8 at page 11. He indicated this had been occurring for almost a year.  Id.  When he was seen by the doctor, Plaintiff stated the only thing done was he "just grabs my testicles and then says okay and gives me some pills."  Id.  Plaintiff stated he wanted to know what was wrong and thought he might need to see a specialist.  Id.

-11-

The interpreter noted that he had seen Plaintiff and the blood in his urine before.  Defts'
Ex. 8 at page 11.  The interpreter also noted Plaintiff was in a lot of pain when this occurred.  Id.

A "dipstick urine" was done and showed "4+ blood in the urine."  Defts' Ex. 8 at page
11.  A urine culture was ordered and Plaintiff was prescribed Keflex.  Id.

That same day, Plaintiff was seen by Dr. Liggett.  Defts' Ex. 8 at page 24.  He  noted
Plaintiff's prior testicular exam was negative.  Id.  Plaintiff had been treated with Cipro and had
a temporary response.  Id.  Dr. Liggett concluded Plaintiff had "recurrent hematula[3] by dipstick
and gross exam."  Id.  Cephalexin was prescribed.  Id.

On October 24, 2009, Plaintiff reported that the medication he was receiving for pain in
his shoulder, back, and testicles was not working.  Defts' Ex. 8 at page 10.  He also indicated he
was having an allergic reaction to the prescribed medication.  Id.

On October 28th, Plaintiff was seen by Dr. Liggett.  Defts' Ex. 8 at page 23.  It was noted
Plaintiff was still complaining of testicular pain and blood in his urine.  Id.  Lab tests  and an x-
ray were ordered.  Id.

### Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences
in the light most favorable to the nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 587 (1986), the record "show[s] that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.
P. 56(c).  "Once a party moving for summary judgment has made a sufficient showing, the
burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence,

---

[3]Believed to be hematuria.

showing that a genuine issue of material fact exists." <u>National Bank of Commerce v. Dow Chem. Co</u>., 165 F.3d 602, 607 (8th Cir. 1999).

      The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586. "They must show there is sufficient evidence to support a . . . verdict in their favor." <u>National Bank</u>, 165 F.3d at 607 (<u>citing Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." <u>Id</u>. (<u>citing Metge v. Baehler</u>, 762 F.2d 621, 625 (8th Cir. 1985)).

### Discussion

      In their motion for summary judgment, Defendants first argue that there is no evidence of any personal involvement on the part of Sheriff Ferguson or Captain Petray. Second, they maintain there is no evidence of intentional misconduct on the part of Pruitt. Third, they argue there is no evidence of deliberate indifference to Plaintiff's serious medical needs. Fourth, Defendants maintain only official capacity claims have been asserted in the complaint and there is no proof of an unconstitutional custom or policy. Finally, Defendants maintain they are entitled to qualified immunity.

      Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. In order to state a claim under § 1983, Plaintiff must allege that the Defendants acted under color of state law and that they violated a right secured by the Constitution. <u>Dunham v. Wadley</u>, 195 F.3d 1007, 1009 (8th Cir.1999). The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional

-13-

right under § 1983.  Daniels v. Williams, 474 U.S. 327 (1986); Davidson v. Cannon, 474 U.S. 344 (1986).  Keeping these general principles in mind, I turn to an examination of the claims asserted by Plaintiff and the Defendants' arguments in favor of summary judgment.  These arguments will not be addressed in the order presented by Defendants.

### *Official versus Individual Capacity Claims*

Defendants maintain only official capacity claims have been asserted in the complaint and there is no proof of an unconstitutional custom or policy.  Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or in both.  In Gorman v. Bartch, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits.  As explained by the Gorman case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available.  *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991).  Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself.  Id. 502 U.S. at 24-27, 112 S. Ct. at 361-62 (1991).  Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense.  Id. 502 U.S. at 25-27, 112 S. Ct. at 362.

Gorman, 152 F.3d at 914.

The Eighth Circuit has consistently advised plaintiffs to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability.  Nix v. Norman, 879 F.2d 429, 431 (8th Cir. 1989); see also Andrus v. Arkansas, 197 F.3d 953, 955 (8th Cir. 1999)(in actions against officers, specific pleading of individual capacity is required to put public officials on notice that they will be

-14-

exposed to personal liability).  When the plaintiff fails to state whether he is suing an official in his individual capacity, the Eighth Circuit has construed the claim to be against the official in his official capacity only.  See Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999)("[I]n order to sue a public official in his or her individual capacity, a plaintiff must expressly and unambiguously state so in the pleadings, otherwise, it will be assumed that the defendant is sued only in his or her official capacity"); Egerdahl v. Hibbing Comm. Coll., 72 F.3d 615, 620 (8th Cir. 1995)("*Nix* requires that a plaintiff's complaint contain a clear statement of her wish to sue defendants in their personal capacities.  Neither a cryptic hint in a plaintiff's complaint nor a statement made in response to a motion to dismiss is sufficient").

Plaintiff is proceeding *pro se* in this case and English is not his first language.  A number of the records submitted indicate Plaintiff had to be addressed through an interpreter.  See e.g., Defts' Ex. 3 at page 6; Defts' Ex. 8 at page 11.  Understanding the distinction between official capacity and individual capacity claims is at times difficult for even those with legal training to make.  See e.g., Vanhorn v. Oelschlager, 502 F.3d 775, 779 (8th Cir. 2007)(state officials misconstrued the differences between official and individual capacity claims and the immunities available).  Given the duty of the Court to liberally construe *pro se* pleadings, the Plaintiff's request for an award of punitive damages, the Defendants' argument that they are entitled to qualified immunity, a defense only available to Defendants sued in their individual capacities, Parrish v. Ball, 594 F. 3d 993, 1001 (8th Cir. 2010), and the fact that it does not appear Defendants will be unfairly prejudiced in anyway, I will construe the complaint as asserting individual capacity claims against the Defendants.

-15-

***Excessive Force Claim***

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." Graham v. Connor, 490 U.S. 386, 394 (1989). "[T]he constitutional standard applied may vary depending upon whether the victim is an arrestee, a pretrial detainee, or a convicted inmate of a penal institution." Andrews v. Neer, 253 F.3d 1052, 1060 (8th Cir. 2001). Here, Plaintiff was a pretrial detainee on July 15, 2008.

"Pre-trial detainees are those individuals who the government has probable cause to believe have committed crimes. Gerstein v. Pugh, 420 U.S. 103, 114 (1975). They are confined pending trial, either because there is cause to believe that they are dangerous or because they cannot afford to make bail." Johnson-El v. Schoemehl, 878 F.2d 1043, 1048 (8th Cir. 1989).

The Schoemehl court noted that:

> [u]nlike convicted prisoners, the state has no right to punish them. *Bell v. Wolfish*, 441 U.S. 520, 535, 99 S. Ct. 1861, 1871-72, 60 L. Ed. 2d 447 (1979). Their confinement conditions are analyzed under the due process clause of the Fifth and Fourteenth Amendments rather than the Eighth Amendment's "cruel and unusual punishment" standard which is used for convicted prisoners. *Id*. The injuries detainees suffer must be necessarily incident to administrative interests in safety, security and efficiency.   As a pretrial detainee, Freeman's excessive-force claim is properly analyzed under the due process clause of the Fourteenth Amendment. *See Graham v. Conner*, 490 U.S. 386, 395 & n. 10 (1989) (due process clause protects pretrial detainee from force amounting to punishment).

Schoemehl, 878 F.2d at 1048.

"In general, the courts analyze excessive force claims of pretrial detainees in the same way as those of arrestees. Andrews, 253 F.3d at 1060 ("The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather

-16-

than the Fourth Amendment, also relies on an objective reasonableness standard.").  The use of force must be necessary to some legitimate institutional interest such as safety, security, or efficiency, and the force used must not be in excess of that reasonably believed necessary to achieve those goals.  <u>Schoemehl</u>, 878 F.2d at 1048.  The relevant inquiry being whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them.  <u>See e.g., Wilson v. Williams</u>, 83 F.3d 870, 875 (7th Cir. 1996).  The Supreme Court has made clear that a case must be decided on the "nature of the force rather than the extent of the injury."  <u>Wilkins v. Gaddy</u>, ___ U.S. ___, 130 S. Ct. 1175, 1176 (2010)(dismissal of case on determination there were *de minimis* injuries was in error).

In this case, the summary judgment record does not contain any reports about the July 15th incident or an affidavit from Pruitt or any other officers present during the incident.  Instead, Defendants merely argue there is no evidence indicating Pruitt intended to cause any pain or injury in the performance of the search.  <u>Defts' Brief</u> (Doc. 18) at page 18.  At the most, Defendants maintain Plaintiff's allegations constitute negligent conduct on the part of Pruitt.

I disagree.  Plaintiff has alleged that Pruitt struck him so hard in the testicles that his testicles were swollen and he was urinating blood.  <u>Resp.</u> at page 1.  To this day, Plaintiff maintains he suffers from pain in his testicular area and has blood in his urine.  Plaintiff's allegations are supported in part by the medical records from both the BCDC and the ADC.  There is nothing in the record that suggests Plaintiff suffered from these medical conditions prior to July 15th.  There is also nothing in the record indicating that such use of force was necessary for any safety or security reasons.

-17-

Defendants also argue they are entitled to qualified immunity on this claim.  They maintain there is no evidence that "Pruitt should have know that performing a routine search of the Plaintiff following a church service and prior to re-entry into the prison population would cause any injury to the Plaintiff or that he intended for such to happen." <u>Defendants' Brief</u> (Doc. 18) at page 24.  Defendants assert that "Pruitt performed his job according to the normal standards of procedure and did not violate any clearly established laws in doing so."  <u>Id.</u>

"Qualified immunity is a defense available to government officials who can prove that their conduct did 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Carroll v. Pfeffer</u>, 262 F.3d 847, 849 (8th Cir. 2001)(quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" <u>Hunter v. Bryant</u>, 502 U.S. 224, 229 (1991)(quoting, <u>Malley v. Briggs</u>, 475 U.S. 335, 343, 341 (1986)).  The inquiry is normally one of pure law. <u>J.H.H. v. O'Hara</u>, 878 F.2d 240, 243 (8th Cir. 1989).

The issue of whether a state actor is entitled to the protection of qualified immunity is a two-step process.  <u>See Washington v. Normandy Fire Protection Dist</u>., 272 F.3d 522, 526 (8th Cir. 2001) .  First, the court must ask whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendant's] conduct violated a constitutional right." <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  Second, the court must determine if the right was clearly established.  <u>See Washington</u>, 272 F.3d at 256.

In <u>Pearson v. Callahan</u>, --- U.S. ----, 129 S. Ct. 808 (2009), the Supreme Court held that "while the sequence set forth [in <u>Saucier</u> ] is often appropriate, it should no longer be regarded

-18-

AO72A
(Rev. 8/82)

as mandatory," and courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."   Id. 129 S. Ct. at 815-816   See also Nelson v. Correctional Medical Services, 583 F.3d 522 (8th Cir. 2009).

Here, as discussed above, viewed in the light most favorable to the Plaintiff, the evidence does not show an objective need for the force alleged to have been used.  At the time force was used, there is no indication Plaintiff was jeopardizing any person's safety or threatening prison security.  See Treats v. Morgan, 308 F.3d 868, 872 (8th Cir. 2002).  I believe there is a basis for Eighth Amendment liability.

In order to overcome the claims of qualified immunity, Plaintiff must also show that his constitutional rights were clearly established. A right is clearly established if its contours are sufficiently clear that a reasonable official would have fair warning of the type of action that would violate that right.

"The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person and the test is whether the amount of force used was objectively reasonable under the particular circumstances."   Winters v. Adams, 254 F.3d 758, 766 (8th Cir. 2001)(internal quotation marks and citations omitted). "It is also clearly established that force may be justified to make an inmate comply with a lawful prison regulation or order, but only if the inmate's noncompliance also poses a threat to other persons or to prison security."   Treats, 308 F.3d at 875 (citations omitted).   When force was applied to Plaintiff, "the law was established that correctional officers do not have a blank check to use force."   Id.

-19-

As discussed above, there is a factual dispute as to the conduct of Pruitt. I cannot at the summary judgment stage, resolve factual disputes in Pruitt's favor or make credibility determinations. <u>See e.g.</u>, <u>Wilson v. Lawrence County</u>, 260 F.3d 946, 951 (8th Cir. 2001)("arguments asserting qualified immunity rest largely on ignoring disputed facts in the record and asking this court to resolve factual disputes in [defendant's] favor.").

With respect to Sheriff Ferguson and Captain Petray, I agree that the record is insufficient to establish they knew of, and were deliberately indifferent to, a pattern of unconstitutional acts by their subordinates. <u>See Andrews v. Fowler</u>, 98 F.3d 1069, 1078 (8th Cir. 1996)(supervisory liability under § 1983 may be established if the supervisor received notice of a pattern of unconstitutional acts committed by subordinates and demonstrated deliberate indifferent to or gave tacit authorization of the unconstitutional acts); <u>Howard v. Adkison</u>, 887 F.2d 134, 138 (8th Cir. 1989)("A single incident, or a series of isolated incidents, usually provides an insufficient basis upon which to assign supervisory liability").

### *Denial of Adequate Medical Care Claim*

The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claim of inadequate medical care under the deliberate indifference standard. <u>See Butler v. Fletcher</u>, 465 F.3d 340, 344 (8th Cir. 2006). To prevail on an Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but

-20-

deliberately disregarded those needs.'"   <u>Jolly v. Knudsen</u>, 205 F.3d 1094, 1096 (8th Cir. 2000)(<u>quoting</u> <u>Dulany v. Carnahan</u>, 132 F.3d 1234, 1239 (8th Cir.1997)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation.   Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." <u>Popoalii v. Correctional Med. Servs</u>, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

In this case, although he was seen numerous times by Dr. Huskins, Plaintiff maintains there was never a determination of what caused the blood in his urine or the pain and swelling in his testicles.  <u>Resp</u>. at pages 5-7.  Plaintiff asserts that the order of the state court judge that he be taken to a specialist was ignored.  <u>Id</u>. at page 5.  Additionally, he states the only medication he was ever given for the pain in his testicles, shoulder, and back was Tylenol which was insufficient.  <u>Id</u>. at pages 5-7.  Finally, Plaintiff maintains he was given no medication to help him sleep and was told that sleeping medication was not provided to inmates.  <u>See e.g., Defts' Ex.</u> 2 at page 29.

It is well settled that a "prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation." <u>Nelson v. Shuffman</u>, 603 F.3d 439, 449 (8th Cir. 2010)(internal quotation marks and citation omitted).  An "inmate must clear a substantial evidentiary threshold to show the prison's medical staff deliberately disregarded the inmate's needs by administering inadequate treatment." <u>Id</u>.  Despite this, issues of fact exist when there is a question of whether or not medical staff exercised independent medical judgment and whether the decisions made by medical staff fell

-21-

so far below the reasonable standard of care as to constitute deliberate indifference.  See Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990).

In this case, while Plaintiff was seen numerous times and prescribed medication, on a number of occasions, he advised the medical staff that the medication was not working, he was in pain, and could not sleep or eat.  Despite this, Dr. Huskins' notes indicate Plaintiff reported being much improved.  Clearly, the records are contradictory as to whether the medication was providing Plaintiff any measure of relief.   With respect to the testicular pain and blood in Plaintiff's urine, Dr. Huskins notes do not indicate whether he ever determined the cause of these problems, did any testing to determine the cause, or determined testing was unnecessary.

As noted above, Plaintiff submitted repeated requests stating that Tylenol was inadequate in providing pain relief.  There is no indication that other pain medications, narcotic or not, were considered.  Nothing in the record suggests medical personnel considered Plaintiff's complaints of pain to be exaggerated or not supported by his medical condition.

The record indicates that the policy was not to provide any sleep aids.  From the record evidence, it appears this policy was applied without regard to the medical condition of the inmate.

In this case, I believe there are genuine issues of fact as to whether Dr. Huskins exhibited deliberate indifference to Plaintiff's serious medical needs.  With respect to Sheriff Ferguson and Captain Petray, although supervisors cannot be held liable on a theory of *respondeat superior*, they may be held liable if they knew the prisoner's "serious medical needs were not being adequately treated yet remain indifferent." Langford v. Norris, No. 09-1862, 2010 WL 2813551, *10 (8th Cir. July 20, 2010)(citation omitted).  Captain Petray responded to Plaintiff's requests

-22-

and grievances and therefore had actual knowledge of Plaintiff's serious medical needs and of his complaints of inadequate treatment.

Similarly, I believe there are issues of fact as to whether the County's policies, or lack thereof, caused, or contributed to, the alleged inadequacies in the provision of medical care and prescription medications.  County policy, in regard to the care and custody of detainees, is, of course, established by the Sheriff.  Ark. Code Ann. § 12-41-502 (Supp. 2010)("The county sheriff of each county in this state shall have the custody, rule, and charge of the jail within his or her county and all prisoners committed in his or her county, and he or she may appoint a jailer for whose conduct he or she shall be responsible").

Defendants also argue that they are entitled to qualified immunity on these claims.  Defendants' Brief (Doc. 18) at page 24.  They maintain "[t]here was no evidence which could have lead the Court to the conclusion that the Defendants should have known that treating Plaintiff in conformity with Dr. Huskins' professional opinion and training would constitute a violation of a clearly established right."  Id.

I disagree.  I believe there are issues of fact as to whether the care received by the Plaintiff was so deficient that it violated the Eighth Amendment.  It is clearly established that deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment.  Farmer v. Brennan, 511 U.S. 825, 828 (1994).  See also McRaven v. Sanders, 577 F.3d 974, 980 (8th Cir. 2009)("A detainee's right to medical treatment is clearly established").  Furthermore, the law provides that "ignoring . . . complaints about receiving deficient medical care contravene[s] the clearly established principles of Eighth Amendment jurisprudence."  Langford, 2010 WL 2813551, *12.

-23-

**Conclusion**

For the reasons stated, I recommend that Defendants' motion for summary judgment (Doc. 17) be granted in part and denied in part.  Specifically, I recommend the motion be granted with respect to Plaintiff's supervisory liability claim against Sheriff Ferguson and Captain Petray stemming from the alleged use of excessive force against him by Deputy Pruitt.  In all other respects, I recommend the motion be denied.  Further, I recommend that Plaintiff be directed to file a motion to amend his complaint to add Deputy Tucker and Deputy Johnson as Defendants if he intends to pursue excessive force claims against them.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **24th day of August 2010.**

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-24-